IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Christine Mooberry, | ) | Civil Action |
| | ) | No. 2:20-cv-00769-RMG-MGB |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **PLAINTIFF'S MEMORANDUM IN** |
| | ) | **OPPOSITION TO DEFENDANT'S** |
| Charleston Southern University, | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT** |
| Defendant. | ) | |
| _____ | ) | |

Plaintiff Christine Mooberry ("Coach Mooberry" or "Mooberry") submits this Memorandum of Law in opposition to Defendant Charleston Southern's ("CSU") Motion for Summary Judgment.

## FACTS

Defendant hired Mooberry as the Head Women's Volleyball coach in May 2013. Ex. 1 - Mooberry Dep. 14:11-15.[1] Throughout her employment, Mooberry only received 1-year contracts and was never offered a multi-year contract. Ex. 2; Ex. 3 - Mooberry Decl. ¶ 4. In addition to her status as an employee, Mooberry was also enrolled as a student in Defendant's Graduate School for the spring 2019 semester. Ex. 3 at ¶¶ 14-16.

### CSU's History of Discrimination and Retaliation

During Mooberry's first year as Head Coach, she attempted to begin re-building the volleyball team she had inherited. However, almost immediately after her hiring, she began to notice differences in the way the female athletic teams and female coaches were treated by administration in

---

[1] CSU does not have a men's volleyball team. As such, for purposes of efficiency when referring to the "volleyball team" it should be construed as the "women's volleyball team," although the term "women" will not be used with respect to every reference.

comparison to the way the male athletic teams and male coaches were treated. Mooberry Dep. 22:22-23:13.

Mooberry's main concern related to the men's basketball team coached by Barclay Radebaugh, a male. *Id.* at 29:11-30:10. She testified that "whatever Barclay wanted, Barclay got. And the rest of us were expected to work it out after that." *Id.* at 30:7-10. Mooberry brought her concerns that a male coach was being treated more favorably to Hank Small, the Athletic Director at the time, but Small continued to give preference to the men's basketball team and its male coaches. *Id.* at 32:24-33:2; 36:1-9. She brought concerns to Small that she was forced to take the worst practice times compared to men's basketball. *Id.* at 29:1-30:10. She also complained about men's basketball practices regularly running late, impeding the start time for the volleyball team to begin practice in their already later time slot. *Id.* at 36:22 - 37:3. Despite bringing her concerns to Small, Mooberry's concerns were dismissed. *Id.* at 37:12-13. Mooberry also identified inequitable treatment between herself and the male coaches and men's programs and her female program in the matter of camp scheduling. *Id.* at 38:15 – 42:22. Mooberry testified that she was not given equal opportunities to run camps like the male basketball coach and even in running camps, she was unable to run the camp uninterrupted from the men's basketball coach/team. *Id.* Small was notified again of the issues and Mooberry was disregarded once more. *Id.*

These issues came to head in July 2015 when the men's basketball coach physically threatened Mooberry in her office. *Id.* at 44:12-51:10. During this encounter, Radebaugh sought to change the previously agreed upon camp time for the volleyball team and Mooberry refused. *Id.* Radebaugh then came within a foot of her face, pointed his finger at her, and threatened to turn her in to Small if she did not coalesce to his demand. *Id.* Mooberry did not concede, and Radebaugh followed through on his threat to turn her in while providing a false statement to Small about what happened. Ex. 5 at 29. Despite Mooberry providing corroborating witness statements from two other

2

female coaches who witnessed Barclay physically threaten her, Small took no action against Radebaugh, and Mooberry never heard anything back. Ex. 5 at 30-38; Mooberry Dep. 48:25-49:2; Ex. 6 - Small Dep. 66:14 – 68:14.

In 2016, Mooberry attended a meeting with the other head coaches, various administrators, and the university president at the time, Dr. Jairy Hunter. Mooberry Dep. 66:14 – 70:18. Dr. Hunter stated that "Title IX is the dumbest thing ever" at the meeting. *Id.* Ashton Turner (Senior Women's Administrator) who was also present at the meeting, recounts that Dr. Hunter may have been speaking in the context of one of two Title IX female student sexual assault complaints that were ongoing at the time. Ex. 7 - Turner Decl. ¶ 8. Hunter began by addressing "the men in the room" and stated that the men in the room needed to "bring their sons/grandson/nephews in and help protect them and speak with them" because the "women were liars and out to get them [the men]." *Id.* Following this meeting, Mooberry and Turner had a private conversation regarding Hunter's comments. *Id.* at ¶ 9. When Mooberry questioned Turner about what they could do, Turner told her there was nothing they could do because "if you or I say anything we will be fired." *Id.*

In or around June 2016, Mooberry had also previously scheduled her volleyball summer camp dates in January of that year, which Small had approved. Mooberry Dep. 79:9-80:25. However, in June and in an effort to accommodate the men's basketball program, Small sought to re-schedule his semi-annual retreat to one of the dates that Mooberry had been approved to conduct and work her summer camp.[2] *Id.* Small would not permit her to miss her pre-approved summer camp and stated "this retreat trumps your little volleyball camp." *Id.* Consequently, Mooberry escalated her concerns to Human Resources and Luke Blackmon, explaining that Small had permitted male coaches to miss the retreat on prior occasions in order to conduct male summer camps and she felt the treatment she

---

[2] Denying a coach the opportunity to attend the already scheduled summer camp results in lost recruiting opportunities for the team, as well as supplemental income for the coach. Ex. 4 - Barber Dep. 118:9-19.

was receiving was inequitable. Ex. 8 - Walke Dep. 88:9-92:14. No one opened an investigation into Small based on Mooberry's complaint. *Id.* at 94:17-20. Although she was ultimately able to work her summer camp after her intervention to HR and Blackmon, Small sought to make an example of Mooberry at a head coaches meeting thereafter on July 27, 2016, by trying to humiliate her. Mooberry Dep. 79:22-80:25. After the meeting, coaches asked Mooberry what she had done to make Small so upset with her. *Id.*

After receiving no traction with her complaints made directly to Small, in August 2016 Mooberry began making official written complaints to Blackmon, an executive level administrator. Ex. 5 at 23-28. She reported targeting from Small, Title IX issues, gender culture concerns, gym space and camp inequities based on gender, bullying by the men's basketball coach, and a litany of other gender-based concerns. *Id.*; Ex. 9 - Blackmon Dep. 80:25-95:16; 104:9-116:4. Thereafter, Blackmon scheduled a meeting between Small, Radebaugh, Mooberry, and Fred Applin (Womens' Basketball coach) to discuss gym scheduling and camps moving forward. *Id.* at 116:12 – 118:21. Despite the meeting, problems remained ongoing. *Id.* Blackmon testified that he cannot recall whether he ever had a conversation with Small about not retaliating against Plaintiff. *Id.* at 129:7-11.

In March 2017, Mooberry had another issue with Small relating to a semi-annual retreat scheduled for May. Ex. 10. Plaintiff's assistant coach, Jordan Fish, sought permission to miss the semi-annual retreat in order to attend a special family event. *Id.* Thus, Plaintiff went to Small on Fish's behalf to see if it would be possible for Fish to miss the retreat. *Id.* At her meeting with Small, Small informed her that both she and Fish would be disciplined if Fish missed the retreat. *Id.* Indeed, a "letter of admonishment" was drafted for Mooberry by Small and given to her. *Id.* Fish attended the retreat after the discipline threat. *Id.* Although the letter of admonishment was not issued, Plaintiff raised her concerns of retaliation and gender discrimination with Blackmon again noting the difference in treatment between male and female coaches. Ex. 5 at 12-22.

4

On May 30, 2017, Plaintiff submitted an email with a 10-page attachment entitled "My Story" to Blackmon setting forth in specific detail her many complaints of gender discrimination. Ex. 5 at 12-22; Blackmon Dep. 155:8-171:24; Ex. 11. Plaintiff raised concerns regarding "the condescending attitudes and mannerisms towards women," "double standards" between male coaches and female coaches, discrepancies in pay between herself only receiving 1-year contracts and male coaches performing at a lesser level than herself earning multi-year contracts, retaliation, and the inequitable treatment her team was receiving compared with male teams. *Id.* As a result of this letter, Blackmon testified that he addressed it by "meeting with Small." Blackmon Dep. 163:7-11. Small, however, testified that he does not remember ever being asked by Blackmon about his treatment of Plaintiff or problems he was having with Plaintiff. Small Dep. 92:22-25. Small's employment with CSU ultimately came to an end around April 2018 when he retired. *Id.* at 8:12-14.

### Mooberry's Employment - the Jeff Barber Year

Jeff Barber was hired by Luke Blackmon as the new Athletic Director in late May 2018. Barber Dep. 10:2-5; 22:21-23. In his role as AD, Barber testified that he directly supervises all of the head athletic coaches, including both Mooberry and her successor. *Id.* at 16:9-18; 17:14-18. Barber did not know if CSU had policies preventing retaliation and was not aware of having been given any training from CSU or any other schools on whether he could retaliate against someone if they brought a complaint of discrimination forward. *Id.* at 31:8-20.

Around June 2018, Barber had a one-on-one meeting with Mooberry. *Id.* at 85:21-25. During this meeting, she raised various issues she had experienced in the past to Barber, including the equitable gym time issues, her prior issues with Radebaugh, and summer camp issues she experienced under Small's leadership. *Id.* at 86:11-19; 90:10-17; 100:17-20. Barber also testified that he was informed by Blackmon about Plaintiff's prior complaints. *Id.* at 89:17-25.

5

Mooberry was hopeful that the circumstances might improve under Barber's new leadership. Unfortunately, they did not. On July 30, 2018, she still did not have a solid schedule for her volleyball team practices, which were scheduled to begin on August 7, one week later. Mooberry emailed Barber, stating that a meeting would be beneficial prior to the start of the season. *Id.* at 111:21 – 113:5; Ex. 5 at 9. In late June 2018, Mooberry's female student-athletes also complained to her and her assistant coach regarding the inequities in gym space between the volleyball team and men's basketball team, which Mooberry forwarded on to Barber while noting the team struggled with "entitlement culture." *Id.* at 109:7-111:20; Ex. 5 at 10-11. In late 2018, Mooberry began preemptively inquiring with Barber and the men's basketball team about securing a firm practice schedule for the spring 2019 volleyball season. *Id.* at 172:22 – 178:17; Mooberry Dep. 93:24-94:12; Ex. 5 at 3-6. She was again unable to obtain a response from anyone and was dismissed until January when the students finally returned to school and had their very first day back to practice. *Id.* Barber also testified that Mooberry brought up inequitable gym time and camp concerns with him in January 2019. Barber Dep. 172:4-6; Ex. 5 at 1. On January 29, 2019, Mooberry specifically emailed Barber about the need to schedule her summer camp dates as "a lot of programs already have theirs out and it would be a positive move to have ours out there as well." Ex. 5 at 1. She was informed her contract was not being renewed a week later on February 4, 2019.

## Mooberry's Termination

Barber testified that the decision to terminate Mooberry was made by him, Blackmon, Dr. Costin, and Walke. Barber Dep. 128:16-21. The decision to terminate her was made "in the days" leading to the final meeting . . . on February 4, 2019. Ex. 24 at 3 – Def's. Interrog. No. 5. Notably, Barber did not schedule the meeting with Mooberry to terminate her. Rather, on January 30, 2019, Mooberry attempted to schedule a post-season meeting of her own with Barber to discuss her pending concerns regarding gym scheduling. Barber Dep. 178:14-179:24. The post-season meeting was

ultimately scheduled for February 4, 2019. Barber asked Ashton Turner to attend the meeting with him. *Id.* at 180:2-25. Lindsey Walke was also asked to attend the second portion of the meeting. *Id.* During the meeting, Barber proceeded to tell Mooberry that he felt like the school needed to "move in a new direction." *Id.* He did not provide her with any details about why she was being terminated. *Id.* Mooberry testified that after Barber told her that her contract was not being renewed, he stated that "maybe this is a good thing. It is hard coaching at this level with little kids. You should consider coaching at the high school level instead." Mooberry Decl. ¶ 10. After Plaintiff informed Barber that she was concerned about the loss of her health insurance because she was pregnant at the time, Barber stated "your husband probably has better health insurance anyway." *Id.*

### Mooberry's Successor - David McFatrich

Approximately two months after Mooberry's termination, Defendant replaced her with a male, David McFatrich. When McFatrich was hired he was offered a 3-year contract lasting through 2022. Ex. 14 at 1. His contract also contained an academic achievement bonus providing an extra $5,000.00 if his team achieved a cumulative team GPA of 3.25 or higher at the end of the spring academic semester, which Mooberry was never offered. *Id.* at 3.

Almost immediately after assuming his new post, McFatrich became the subject of an NCAA investigation for potential recruiting rule violations. Ex. 16.[3] As part of the NCAA investigation, the NCAA forensically imaged McFatrich's cell phone and ultimately concluded that he had made 79 impermissible contacts with at least eight student-athletes and two parents of student-athletes he coached or recruited at a previous school. *Id.* One of the student athletes that was impermissibly contacted ultimately ended up transferring to CSU. *Id.*

---

[3] McFatrich also testified that he has had 6-7 NCAA violations at other schools where he worked previously. Ex. 15 – McFatrich Dep. 90:18-91:4.

On October 7, 2020, the NCAA publicly released its findings and penalties from McFatrich's investigation. *Id.* at 5-6. As a result of McFatrich's conduct the school and volleyball program was placed on a one-year NCAA probation; Defendant was ordered to pay a $5,000.00 fine to the NCAA; McFatrich had various limitations on recruiting placed on himself personally and was mandated to attend an NCAA rules convention at his own expense; McFatrich was suspended from coaching 10% of the next volleyball season with any wins from those suspensions not counting towards his coaching record; and finally, CSU was **mandated** to include a letter of admonishment in McFatrich's human resource record. *Id.* Despite the NCAA's directive, at Walke's deposition, she testified as the Director of Human Resources (and after reviewing the entirety of McFatrich's produced personnel file) that no letter of admonishment was contained in McFatrich's personnel file as of March 11, 2021, and no one had asked her to create or include a letter of admonishment. Walke Dep. 159:18-162:17. Barber also testified that he has no intention of terminating McFatrich's contract for his 79 NCAA recruiting violations. Barber Dep. 191:5-7.

In addition to his issues with the NCAA, McFatrich also received serious and concerning complaints from his own student athletes. In an email from Lisa Gilmore (Compliance) to Barber dated February 20, 2020, Gilmore relayed that she had met with some of the volleyball student-athletes at their request to raise various concerns regarding McFatrich. Ex. 17 at 1-2.[4] After receiving this email from Gilmore, Barber testified that he did not meet with the student athletes himself because he "didn't feel like it was necessary." Barber Dep. 216:1-12. Barber did, however, take the opportunity to meet and address the student complaints with McFatrich. *Id.* at 217:1-14. Barber testified that there are "two sides to every story," McFatrich did not agree with the student

---

[4] Briefly, the volleyball athletes highlighted poor communication, poor time management (failing to have a plan for practice, lateness, disrespect to other sports programs), nepotism, retaliation, gender-based comments ("[d]uring meetings [McFatrich] will show film of Olympians or *male players* and tell them to 'do that' but won't offer instruction or provides unrealistic expectations based on their size, age, experience, and *even gender*"), amongst others. *Id.* (emphasis provided).

complaints, and McFatrich was "working on being the best that he can be." *Id.* This was an assumption never provided to Mooberry.

The student complaints made to Gilmore were also echoed in McFatrich's own student athlete evaluations. Ex. 17 at 3-10; Ex. 26. The evaluations include allegations of failing to provide a Christian playing environment; failing to coach every position equally; lack of a Division I experience; nepotism; emotional abuse; poor communication skills; and McFatrich making **inappropriate racist and sexist remarks** about students; amongst a wide array of others. *Id.* One student-athlete was so upset with McFatrich's coaching that she transferred out stating "it was sad seeing the negative effect he had on everyone. It was very disturbing." Ex. 17 at 11-14. Barber testified that despite receiving the concerning email from Gilmore and the student evaluations, there was "nothing that made him want to reconsider McFatrich's contract." Barber Dep. 219:3-6.

### Other Complaints of Gender Discrimination by Female Coaches/Administrators

Defendant has been on notice that female coaches have made gender discrimination complaints about the athletic department since 2013, and those complaints continue to the present day. Ex. 5; Ex. 7; Ex. 18; Ex. 19. In October 2013, Tosha Ansley, Head Coach Women's Track, filed a formal written complaint of gender discrimination. Ex. 18 at 4-5. The complaint highlighted issues of a similar nature as Mooberry. *Id.* For example, Ansley's complaint stated that Small had told her "it's just easier to deal with men versus women," he would listen to concerns raised by male coaches while disregarding the same concerns presented by female coaches, paid male coaches more than female coaches, among many others. *Id.* At her deposition, the Director of Human Resources who also served in that same role in October 2013, stated that she had never seen Ansley's 2013 written complaint before the day of her deposition and was not asked to investigate Ansley's allegations. Walke Dep. 130:4-132:20.

Ansley filed a second gender complaint with Human Resources and Blackmon regarding Small in 2016 as well, around the same time Mooberry was making complaints. Ex. 18 at 1-2. Ansley verbally informed Walke and Blackmon that "she [Tosha] had some issues with Hank Small and how he treats women. Tosha told Luke that she felt Hank discriminates against women and that he told her previously that he'd much rather work with a male coach than a female coach." *Id*. Despite Ansley's second complaint made to both Walke and Blackmon, Walke testified that she did not know whether an investigation was opened into Small. Walke Dep. 126:1-18.

At least two other female coaches, Venus Taylor (Head Coach Women's Softball) and Anca Dumtriescu (Head Coach Women's Tennis), have raised gender-based concerns in relation to the current Athletic Director, Jeff Barber. Ex. 19. At his deposition, the current University President, Dr. Costin, testified that he had personally received a complaint of gender discrimination from Taylor concerning Barber in or around early 2021. Ex. 20 - Costin Dep. 94:14-95:18. This testimony is supported by a host of documentation demonstrating complaints Taylor previously made to administrators regarding gender inequities in the athletic department during her tenure, many similar to the complaints raised by Mooberry. Ex. 19.[5] In an email from Gilmore (Compliance) to Barber on September 8, 2020, Gilmore relayed that she had had a phone conversation with Taylor regarding gender inequities and that Taylor "mentioned a few terms and words that *sparked me to be cautious*: 'Title IX compliance,' 'discrimination,' 'lawyer friends,' 'not wanting to get involved in a lawsuit.'" Ex. 19 at 1.

---

[5] A brief summary of Taylor's gender complaints include: male teams receiving steak dinners and other excessive meals while her team, and Taylor personally, was disciplined for ordering appetizers and dessert on one occasion (this difference was described by a CSU compliance officer as "on the surface, it may seem that a football player gets more food, but that's because **his caloric need is greater than the tennis player**,"); inequitable treatment with respect to ordering sports equipment; inequitable scrutiny of team credit card purchases; verbally abusive behavior from Barber; and inequitable pay for female coaches. Ex. 19.

# ARGUMENT

## I.    Title VII Discrimination

### A.    Methods of Proof in Employment Discrimination Cases under Title VII

There are "two potential avenues" of proof through which a plaintiff can establish intentional discrimination under Title VII. *See Perkins v. Int'l Paper Co.,* 936 F.3d 196, 206 n.4 (4th Cir. 2019). First, the plaintiff "may, under what has been referred to as the 'mixed motive' framework, present direct or circumstantial evidence that creates a genuine issue of material fact as to whether an impermissible factor . . . solely or partially motivated the employer's adverse employment decision." *See id.*

The second avenue of proof is the three-part burden-shifting paradigm set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), also known as the "pretext framework." *Id.* Under the pretext framework, the plaintiff bears the initial burden of establishing a *prima facie* case of Title VII discrimination. *Ferguson v. Waffle House, Inc.,* 18 F. Supp. 3d 705, 719 (D.S.C. 2014). Specifically, the plaintiff must show: (1) membership in a protected class; (2) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class, or some other evidence giving rise to an inference of unlawful discrimination. *Id.* The fourth element of the *prima facie* case has also been construed to include that the "position remained open or was filled by similarly qualified applicants outside the protected class." *Hill v. Lockheed Martin Logistics Mgmt.,* 354 F.3d 277, 285 (4th Cir. 2004).

The burden then shifts to the defendant "to show a legitimate, nondiscriminatory reason for the adverse employment action." *Ferguson,* 18 F. Supp. 3d at 719. If the defendant provides a legitimate, nondiscriminatory reason for the adverse employment action, the burden is then on the

11

plaintiff to demonstrate that the defendant's asserted reasons "are a mere pretext for its true discriminatory motives." *See id.*

### B.    Use of Comparator Evidence Under Title VII Generally

If a plaintiff chooses to put forward comparator evidence to prove intentional discrimination, whether through the direct or pretextual avenues of proof, she must show that she is "similar in all *relevant* respects to their comparator." *Haywood v. Locke,* 387 F. App'x 355, 359 (4th Cir. 2010) (emphasis provided). "Such a showing would include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Id.* (quoting *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir. 1992)).

As this Court has previously observed, "such comparisons, 'will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances.'" *Young v. CareAlliance Health Servs.,* No. 2:12-cv-2337-RMG, 2014 WL 4955225, at *4-6 (D.S.C. Sept. 29, 2014) (quoting *Cook v. CSX Transp. Corp.,* 988 F.2d 507, 511 (4th Cir. 1993). "In determining whether a plaintiff's misconduct is *comparable in seriousness* to that of employees outside the protected class, a court should consider 'the gravity of the offenses on a relative scale'" as the determination is not whether two acts are identical but, rather, whether the acts of the proposed comparator are of comparable seriousness (or even possibly more serious) than the acts attributed to the plaintiff. *Charlot v. Donley,* No. 3:11-00579, 2013 U.S. Dist. LEXIS 46674 (D.S.C. Mar. 29, 2013) (quoting *Moore v. City of Charlotte,* 754 F.2d 1100, 1107 (4th Cir. 1985) (emphasis provided)).

### C.    Mooberry's Proof of Intentional Discrimination

Here, Mooberry is a female who began working for Defendant in May 2013 as Head Women's Volleyball Coach. Despite successfully working for Defendant for close to six years, her

coaching contract was not renewed by Defendant in February 2019.[6] As such, under the *McDonnell Douglas* pretext avenue of proof she satisfies elements 1 and 3. Additionally, Mooberry's position was filled by a male outside of her protected class and, thus, element 4 of the *prima facie* case has also been satisfied under the Court's interpretation of that element in *Hill v. Lockheed Martin Logistics Mgmt.,* 354 F.3d 277 (4th Cir. 2004).

As to element 2 of the prima facie case under the *McDonnell Douglas* framework, Defendant does not argue that Mooberry cannot make a *prima face* showing. (ECF No. 34-1 at 8) ("it is assumed, *arguendo*, that Plaintiff may establish a *prima facie* case.") Rather, Defendant argues only that she cannot prove Defendant's proffered reasons for its actions are pretextual. As many of these issues overlap and for the sake of brevity, they will be discussed in conjunction with one another.[7]

Before delving into each of Defendant's specific proffered reasons for its termination of Mooberry, it is important to note that Barber testified that even at her termination meeting he did not share *any details* with her about the reason why her contract was not being renewed. Barber Dep. 180:20-25. Similarly, Mooberry's personnel file is completely devoid of any performance documentation relating to any issues, including any documentation of the reasons now proffered by Defendant for its actions. It was not until after Mooberry retained counsel and initiated EEOC proceedings that Defendant began to articulate in any detail alleged performance deficiencies. In an email dated July 2, 2019, (following Mooberry's termination and only *after* counsel's mailing of an

---

[6] *Ackerson v. Rector & Visitors of the Univ. of Va.,* 2017 U.S. Dist. LEXIS 184946 (W.D. Va. Nov. 7, 2017) ("Courts have recognized that 'where an employee seeks renewal of an employment contract, non-renewal of an employment contract constitutes an adverse employment action for purposes of Title VII . . .'").

[7] *See Gagne v. SAFE Fed. Credit Union,* No. 3-18-cv-208-JMC-PJG, 2020 WL 2476651, at *4 (D.S.C. Jan. 30, 2020) ("[b]ecause the defendant's proffered reason for its actions [was] that the plaintiff was not meeting expectations, [such that] the evidence as to the *prima facie* issue and the pretext prong of *McDonnell Douglas* framework overlap[ed]"); and *CareAlliance Health Servs.,* 2014 WL 4955225 at *4-6 (D.S.C. Sept. 29, 2014) (considering comparator evidence at both the *prima facie* stage and the pretext stage).

initial demand letter to Defendant) HR Director Walke emailed Barber and stated: "Jeff, can you look through the file you have on Christy Mooberry and see if there is any other paperwork related to poor performance, etc.? ***The lawyer is asking <u>if we have anything</u> and as I mentioned to you before, Hank [Small, prior Athletic Director] never gave us anything, thanks***." Ex. 21 at 2. (emphasis provided). As many courts have held, including the Fourth Circuit, *post-hoc* explanations for a termination decision may suggest discriminatory motive. *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F. 3d 639 (4th Cir. 2002) ("The fact that an employer has offered inconsistent *post-hoc* explanations for its employment decisions is probative of pretext").[8]

Barber testified that he *never spoke* with Plaintiff at any time during her employment about "any one of these concerns [the personal observations and student feedback he allegedly received] that you just listed." Barber Dep. 152:19-22. Although an employer is not required under law to provide employees with a reason for their termination at the time of their firing, the failure to do so may be probative of intentional discrimination, particularly when combined with other evidence as described below.

Defendant's own Employee Handbook states "[t]he University's expectations of an employee's job performance and work conduct are communicated and explained during initial hire, *throughout the course of employment* and through an annual staff evaluation." Ex. 22 at 2. Barber echoed these sentiments by testifying that his personal management style for providing feedback to the employees he supervises is that "*as things come up, **you deal with them immediately**. So you **don't** hold everything and have an annual, you know, come-to-you meeting.*" Barber Dep. 74:15-25

---

[8] *Weiss v. JP Morgan Chase & Co.,* 332 Fed. App'x 659, 663 (2nd Cir. 2009) (reversing grant of summary judgment to employer in light of various evidence of pretext, including *post-hoc* explanations that were not articulated to plaintiff during her employment or at the time of firing); *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 576-77 (4th Cir. 2015) (same and also noting *lack of contemporaneous documentation* of purported performance deficiencies as evidence of pretext as well).

(emphasis added). He also stated that he believes it is important to document performance issues "so you don't have to rely on your memory." *Id.* at 75:3-7. Courts routinely consider an employer's *selective* failure to follow its own internal employment procedures and policies as probative of pretext. *Mohammed v. Cent. Driving Mini Storage, Inc.,* 128 F. Supp. 3d 932, 952 (E.D. Va. 2015) (an employer's "selective, erratic, or case-by-case application" of a policy "may suggest pretext."). As described in detail below, Barber appears to have followed both CSU's own written policy and his self-described management style with respect to male coaches while abandoning this approach with respect to Mooberry.

### D.    Defendant's Specific Proffered Reasons for Termination

### i.    Barber's Undocumented Visual Observations

At his deposition and for the first time, Barber highlighted a slew of subjective visual "observations" he purportedly made about Mooberry in the fall of 2018 while watching her in practice and competition. These include some of the following: Mooberry having "confused looks," "looking lost during time-outs," having a "blank expression," standing off to the side and "looking unconfident," "didn't come across as having the strength" to be a Division I coach; and "didn't come across as having the persona" to be a Division I coach.[9] Barber Dep. 131:1-132:13; 134:2-6. When questioned about whether Barber could provide a more specific example of Mooberry having a "blank expression," he testified "no, I can't." *Id.* at 134:2-6. When questioned whether in making these "observations" about Mooberry's coaching style, if Barber ever *documented* them in any manner, he stated "not that I remember, no." *Id.* at 182:24-183:4. When questioned whether Barber

---

[9] In November 2016, Mooberry came in second place for Big South Conference Coach of the Year. Ex. 3 – Mooberry Decl. ¶ 13. The other Big South Conference head coaches who voted on the award certainly did not believe Mooberry lacked the "strength" or "persona" of a Division I coach.

ever spoke with Mooberry during her employment about any of his concerns, he testified "no." *Id.* at 152:19-22.[10]

What Barber did do, however, is issue a Tweet on his official Twitter account dated November 16, 2018, after Mooberry's team participated in the Big South Conference tournament stating "[r]eally proud of @CSU_Volleyball . .. played their hearts out in **one of the best matches I've ever witnessed.**" Ex. 12 at 1. This was Mooberry's final game coaching before she was terminated. While a defendant is certainly entitled to put forward a subjective reason for its decision, subjective reasons are subject to "particular scrutiny" and often require a credibility determination by the jury. *Page v. Bolger,* 645 F.2d 227, 230 (4th Cir. 1981) (en banc); *Hill v. Va. DOT,* 2013 U.S. Dist. LEXIS 11202 (W.D. Va. Jan. 28, 2013); *See also Reed v. Buckeye Fire Equip.,* 241 Fed. App'x 917 (4th Cir. 2007) ("There is *no documentation* of any of the alleged problems with Appellant's performance or work habits….there is at least a triable issue of fact."). Barber's own tweet directly contradicts his allegation that Mooberry did not have the "characteristics of a Division I coach." A reasonable jury could conclude that Defendant's visual "observations" are pretext for discrimination.

### ii.    Anonymous Student Athlete Comments

Defendant's second post-hoc explanation for its decision to terminate Mooberry is that Barber allegedly received student athlete complaints about her performance. As a starting point for this

---

[10] Defendant also did not raise any argument about negative visual "observations" such as those Barber referenced at his deposition in the EEOC/Human Affairs proceedings. *See E.E.O.C. v. Sears Roebuck & Co.,* 243 F.3d 846 (4th Cir. 2001) (offering different justifications at different times is, in and of itself, probative of pretext). Ex. 23 at 3. Similarly, Defendant's own interrogatory responses did not disclose any negative "visual observations" made by Barber as a reason for termination. Ex. 24 at 2. Barber also attempted to pile on another new reason for Mooberry's termination at his deposition by claiming there was an issue with her "bringing her baby to campus" two times and that that was part of his concerns about her "not being a Division I coach." Barber Dep. 122:2-124:25. Defendant raised absolutely no concerns to the EEOC or in its interrogatory responses about Mooberry bringing her baby to work and appears to have now abandoned this argument. Ex. 23, Ex. 24 at 3. Nevertheless, this highlights Defendant's history of shifting reasons for its actions, which is evidence of pretext.

analysis, Barber testified that not every student athlete is always satisfied with their coach and will make a complaint for a variety of different reasons. Barber Dep. 75:8-13. He identified the main reason for student athlete dissatisfaction with a coach as "playing time," noting that "typically the student-athletes that don't play are the ones that have the biggest problems." *Id.* at 75:8-24. Furthermore, he testified that "more times than not" he expects some level of dissatisfaction from student-athletes towards their coaches and that he has had athletes quit because they did not like their coach, specifically noting that occurrence in the football program. *Id.* at 78:21-79:12.

Barber confirmed at his deposition that he never talked with Mooberry at any point during her employment about any student-athlete complaints or negative evaluations. *Id.* at 152:19-23. When questioned about why Barber never addressed any alleged issues with her or allow her to provide her side of the story, Barber testified that he had already decided to move in a different direction and felt that anything Mooberry would add would be "irrelevant." *Id.* at 156:3-25; 157:1-5. Here, comparator evidence, described below, strongly suggests that Defendant turned a blind-eye to much more serious student-athlete complaints of male head coaches, took the opportunity to speak with those male head coaches about their student complaints, and elected to take no negative action towards those male head coaches. Additionally, positive student-athlete comments (that are both dated and non-anonymous) from Mooberry's own former athletes and recruits tell a very different story and cast doubt on Defendant's explanation. Ex. 12 at 2-12.[11]

After Mooberry was terminated, she was replaced by McFatrich, a male. McFatrich, like Mooberry, reported directly to Barber. *See Acevedo-Parrilla v. Novartis Ex-Lax, Inc.,* 696 F.3d 128, 144-45 (1st Cir. 2012) (holding that plaintiff's replacement was a similarly situated comparator for pretext analysis). In addition to McFatrich having 79 NCAA violations, Barber confirmed McFatrich

---

[11] Mooberry's assistant coach during her final 2018 season, Laura Grace Belote, also testified that no student-athletes had ever come to her with concerns regarding Mooberry. Belote Dep. 45:17-46:7.

had also received student-athlete complaints. Barber Dep. 191:15-25. Barber then testified that he could not recall "anything serious enough that action was taken, other than a conversation with him. I don't remember exactly what they [the athlete comments] were." *Id.* Barber, however, is the individual responsible for reviewing the evaluations. *Id.* at 192:10-12.

Additionally, Barber testified that he had received an email from Lisa Gilmore, Director of Compliance, on February 20, 2020, about a meeting she had had with the women's volleyball team at their request regarding complaints relating to McFatrich. Ex. 17 at 1-2. Barber testified that he received the email from Gilmore but did not feel it was necessary to talk to the players himself. Barber Dep. 216:1-14. He also noted that there was **nothing in Gilmore's email that made him want to reconsider McFatrich's contract**. *Id.* at 218:20-219:6. Despite not speaking with the volleyball players in person Barber did follow his self-described management style and CSU policy and spoke with McFatrich about the contents of Gilmore's email because there are "two sides to the story," McFatrich did not agree with the complaints, and McFatrich was "working on being the best that he can be." *Id.* at 194:1-5; 207:12-23; 217:1-13. Of course, that is completely contradictory to the approach Barber took with Mooberry where he never met with her to discuss any purported student athlete complaints because, according to Barber, any additional information she might have to offer would be considered "irrelevant." *Id.* at 156:1-157:5. This is a double standard where male coaches are treated more favorably and given the benefit of the doubt. *See* Ex. 25.[12]

To aid the Court's comparator analysis regarding McFatrich's student complaints, counsel has provided Ex. 26 which is a table compiled categorizing and detailing the complaints made against McFatrich by his student-athletes.[13] These student complaints cover a wide range of issues from

---

[12] Plaintiff's expert witness, Dr. Laura Burton, Ph.D, explains in great detail how gender bias can impact the evaluation of female coaches and how gender bias operates in athletic departments, including as it relates to Plaintiff at CSU. Ex. 25.

[13] The original data can be found in Exhibit 17 and was also thoroughly examined at Barber's

inadequate coaching, lack of a Division I experience/Division I coaching, poor communication, poor time management, disrespect to other sports programs, nepotism, targeting/retaliation, failure to follow CSU Christian mission in coaching, inappropriate verbal outbursts **including racist and sexist comments** made to the students, emotional abuse from coach to the students, playing injured athletes, wasting time, amongst a host of others. Ex. 26.

Defendant contends that McFatrich's malperformance is not sufficiently identical to the alleged malperformance of Mooberry and, for that reason, he is not a proper comparator. But Defendant offers no argument at all in this regard. McFatrich was employed in Mooberry's same exact position after she left, reported to the same exact supervisor, and received significant and concerning student-athlete complaints regarding the quality of his coaching and the lack of a Division I athletic experience he was providing for his athletes. Ex. 17; Ex. 26. McFatrich was treated far more favorably than Mooberry. Indeed, Barber spoke with McFatrich about the complaints and provided him an opportunity to correct his coaching and testified that there was "nothing in the student complaints that made him want to reconsider McFatrich's contract." Barber Dep. 219:3-6; 194:3-5; 207:6-23; 217:5-14. In determining whether Mooberry's alleged misconduct is comparable in seriousness to that of employees outside the protected class, a reasonable jury could easily conclude that McFatrich's conduct as identified in his student-athlete complaints is similar, and arguably significantly worse, than any alleged malperformance of Mooberry.

Furthermore, and as described previously, Mooberry, unlike McFatrich, did not have *even one* NCAA rule violation throughout her entire 6-year tenure at CSU.[14] Whereas, McFatrich, in the course of 1 year, incurred 79 NCAA recruiting violations resulting in a host of serious penalties for himself

---

deposition. *See* Barber Dep. 191:15-211:13; 216:1-220:4.

[14] Both coach's contracts required them to follow NCAA rules and regulations and Defendant identified "abiding by NCAA and Big South rules and regulations" as an essential function of Mooberry's job in its interrogatory responses. Ex. 24 at 2 – Def's Interrog. No. 1; Ex. 2; Ex. 14.

and the university. Ex. 16. Defendant's effort to minimize McFatrich's substantiated and punishable NCAA violations only furthers Mooberry's position that Defendant ignores or diminishes the transgressions of male coaches while holding female coaches to a different standard, particularly females who complain about gender inequities. When considering the "gravity of the offenses on a relative scale," a jury could conclude that McFatrich's offenses were at least similar to Mooberry's, and perhaps significantly worse.[15]

### iii.   Win/Loss Record

Turning to Defendant's third proffered explanation that Mooberry was terminated for a poor win/loss record, at his deposition Barber testified that he *did not* have a set standard for coaches about what their win-loss record needed to be because "there are too many factors that go into it [the win-loss record]." Barber Dep. 51:19-24. He also said "[s]o to say you have to win X amount of games in a league and you have massive injuries or whatever else, it's just not fair. *It's not a fair thing to do.* There are too many factors that can come into play." *Id.* at 52:6-10. He testified that it was a "goal" that an athletic team would make the conference tournament but it was not a mandate to having a coaching contract renewed due to a myriad of uncontrollable factors including budget, facilities, injuries, and the type of program a coach might have inherited. *Id.* at 52:11-25. Furthermore, Barber testified that he was "not terminating anyone because they did not make the top third of the conference." *Id.* at 67:5-24.

With respect to Mooberry's final season prior to her termination, the only season in which Barber supervised her, the women's volleyball team went "[r]ight at .500 in the conference and also a

---

[15] Barclay Radebaugh is also an appropriate comparator for Title VII purposes. *See* Ex. 7 – Turner Decl. ¶¶ 13-14, Ex. A – ("Over the past several years, there have been a concerning number of transfers out of the [men's basketball] program for issues related to relationships with student-athletes…Student-athletes have who have sat with us [compliance office] have indicated that they are *afraid to speak up or to evaluate honestly because they are afraid of Coach* [Radebaugh] *or are afraid of what might get back to coach if they complain to administrators.*")

game over 500. *So went okay*." Barber Dep. 121:7-13 (emphasis added). He also noted that Mooberry's final season was an *improvement* over her prior season, when her contract had been renewed. *Id.* at 121:11-13. Indeed, in Mooberry's final season as head coach the volleyball team's overall record was 13W-12L (.520 win percentage), and the team qualified for and participated in the Big South Conference Tournament, which Barber testified was his "goal" for athletic coaches. *Id.* at 52:11-15. According to Barber, Mooberry's final game coaching was one of the best matches "he had ever witnessed." Ex. 12 at 1. When evaluating whether Mooberry met Defendant's *legitimate* performance expectations at the time of her termination, the term "legitimate" means that expectations cannot be a "sham designed to hide the employer's discriminatory purpose." *Addison v. CMH Homes, Inc.,* 47 F. Supp. 3d 404, 419-22 (D.S.C. 2014) (internal citations omitted). Barber also testified that he never had any communications with Mooberry about not winning enough or there being any problems with her winning percentage or how that might affect her in terms of contract renewal. Barber Dep. 121:20-25; 122:5-7.[16]

Contrarily, the Head Athletic Coach of men's basketball, Barclay Radebaugh (male) performed much worse than Mooberry did, but his contract was renewed repeatedly.[17] During the 2020-2021 men's basketball season Radebaugh achieved an overall record of 3W-18L **(.143 win percentage)** and the men's basketball team finished dead last in the Big South Conference.[18] Barber

---

[16] At his deposition, Barber identified two male head coaches who had allegedly not had their contracts renewed due to having a poor win/loss record. This evidence is discussed in the "Retaliation" section of Plaintiff's brief as that is where Defendant raised it in its brief. *Infra* II(B).

[17] While Radebaugh was Head Coach of the men's basketball team and Mooberry was Head Coach of the volleyball team, for purposes of Title VII they are still appropriate comparators as both held the job title of Head Athletic Coach, both had the same supervisor and both were subject to the same polices and rules prescribed by the CSU Non-Faculty Employee Handbook and NCAA. *See Whitehurst v. Bedford Cty. Sch. Bd.*, 2020 WL 535962 (W.D. Va. Feb. 3, 2020) (chief officers [such as CFO, COO, etc.] are without equals in title within their roles in an organization but still appropriate comparators for Title VII).

[18] These statistics are borrowed from the Charleston Southern Athletic Department website: www.csusports.com

testified that Radebaugh's team's record was "very poor" but he, nevertheless, did not plan to terminate the male head coach's contract for lack of success. *Id.* at 220:25-221:25. For the 2019-2020 men's basketball season the overall record was 14W-18L (.438 win percentage) and it finished 7th out of 11 in the Big South Conference. Despite this record, in August 2020 Radebaugh was provided a contract renewal to his already pre-existing and lucrative multi-year contract. Ex. 28 at 1. Radebaugh's prior seasons continue to document average to well below-average records, with some years having 0 wins for the **entire season**.[19]

   As for McFatrich, his record in the 2019 season following Mooberry's termination was 14W-15L (.483), whereas Mooberry's 2018 final year record was 13W-12L (.52). In other words, during Mooberry's final 2018 season, **and the only season in which she was supervised by Barber**, she had a win percentage of .52, better than McFatrich's 2019 win percentage of .483. And this is assuming McFatrich's 2019 wins even count at all given that he was investigated and ultimately found responsible for recruiting violations during this same period. As Barber testified himself, "you can win, but if you're breaking the rules to do it, *then it's an empty win and it doesn't count*." Barber Dep. 47:23-2-48:2; Ex. 16. McFatrich's 2020-2021 record of 7W-5L (.58 win percentage) is almost identical to Mooberry's final 2018 .52 win percentage, and he had to break NCAA rules to even meet her standard.[20]

---

[19] For the 2018-2019 season, the men's basketball team overall record was 18W-16L (.529 win %). In 2017-2018, the men's basketball team had an overall record of 16W-16L (.500 win %). In 2016-2017, the men's basketball team overall record was 12W-19L (.387 win %). For the 2015-2016 season, the men's basketball overall record was 9W-21L (.30 win %). **Notably, in both the 2014-2015 and 2013-2014 men's basketball seasons, Radebaugh achieved 0 total wins for the *entire two seasons* due to the fact that all of Radebaugh's wins were forfeited for NCAA rule violations relating to playing ineligible student athletes.** Yet, Radebaugh's contract was renewed time and time again. Ex. 28.

[20] McFatrich's 2020-2021 coaching record is 7W-5L (.58 win %), not 9W-5L, as he was suspended from two of the games that the volleyball team won and his NCAA agreement mandated that wins from games where he served his suspension could not count toward his coaching record. Belote Dep. 68:11-17; Ex. 16.

**E.    Mooberry's Other Evidence of Discrimination**

Plaintiff will not re-address the facts regarding the many other complaints of gender discrimination made by female coaches and administrators against Barber, Small, and Radebaugh. *See Supra* at 9-10; Ex. 7; Ex. 18; Ex. 19. "As a general rule, the testimony of other employees about their treatment by the defendant is relevant to the issue of the employer's discriminatory intent." *Spulak v. K Mart Corp.,* 894 F.2d 1150 (10th Cir. 1990); *Fox v. GMC,* 247 F.3d 169, 179 (4th Cir. 2001) (pointing to testimony of other employees regarding supervisors' treatment in concluding that plaintiff presented sufficient evidence of hostile work environment). Despite Mooberry's and other female coaches documented complaints of gender discrimination, the Director of Human Resources who has worked for Defendant since 2003 testified that as it relates to CSU's anti-discrimination and anti-retaliation policies, she is "not aware of *any cases* [of gender discrimination] she has [ever] received" from any employee throughout her entire employment. Walke Dep. 53:1-9. Nonetheless, she also noted that she is the individual directly responsible for handling gender discrimination complaints filed by employees, performs the investigations by herself, and has not performed any investigations herself. *Id.* at 27:4-22. *Solomon v. Fordham Univ.,* 2020 U.S. Dist. LEXIS 46350 (S.D.N.Y. March 17, 2020) (failure to follow anti-discrimination policy can give rise to an inference of discrimination).

Additionally, the inherently gender-based comments relayed to Mooberry, Turner, and other females by Barber, Small, and other high-level administrators are also strong evidence of discriminatory intent.[21] Although Barber denies making the comments that were specifically

---

[21] These comments include: "Title IX is the dumbest thing ever" (made to Plaintiff by Dr. Hunter, University President); "it's just easier to deal with men versus women" (made to Ansley by Small); "the reason we don't have men's tennis anymore is because of Title IX" (made to Turner by Small); men need to "bring their sons/grandsons/nephews in and help protect them and speak with them" because the "women [who made sexual assault complaints] were liars and out to get them" (made to Turner by Dr. Hunter, University President"); "your husband probably has better health insurance

attributed to him by Mooberry, a fact dispute exists as to whether they were made or not. If the comments were made, particularly the comment regarding Mooberry being more suited to coaching at the high school level because she has small children, this would be evidence of gender discrimination.

Lastly, although Defendant appears to have abandoned the argument as it was not forwarded in its brief, previously it asserted an argument that Barber also considered a 2017 hiring of an assistant volleyball coach, Rick Banis, in his decision to terminate Plaintiff. Ex. 23 at 3; Ex. 24 at 3. To the extent that argument is not abandoned, it is easily refuted. In 2017, and well before Barber's arrival at CSU, Plaintiff needed to fill an assistant coach position. Thereafter, Blackmon, Small, Dr. Hunter, and Plaintiff all interviewed Banis and approved of his hire. Ex. 31. Blackmon testified that "Rick Banis appears[ed] to be a good coach" and there was nothing that stood out at the time of hiring as a red flag to him.[22] Blackmon Dep. 137:11; 138:12-16. Unfortunately, after his hiring Banis sought to undermine Plaintiff's leadership in a personal desire to replace her as Head Coach and was ultimately terminated in December 2017 at Plaintiff's and Blackmon's recommendation. Blackmon testified that he was "fully supportive of making the decision to let him go." Blackmon Dep. 143:23-24. Barber, who did not even work for CSU at the time the Banis events unfolded, was questioned at his deposition about it and testified he knew "very, very little about that" and had only been made aware of it "through this [lawsuit] process." Barber Dep. 83:1-9. Indeed, Barber could not even recall Banis' name. *Id.* at 121:14-19. ("I feel like yeah, I've heard that name [Rick Banis] somewhere, but I don't know."). It is axiomatic that Barber could not have relied upon events he did not know about

---

anyway" (made to Plaintiff by Barber); "you should consider coaching high school instead because you have small children" (made to Plaintiff by Barber). Ex. 7 - Turner Decl. ¶¶ 8, 15, 16; Ex. 3 – Mooberry Decl. ¶ 10; Ex. 18 at 3.

[22] It is also noteworthy that Banis was not even Plaintiff's first choice of a candidate at all. She sought to hire another candidate of Catholic background and was denied her choice of hire by Blackmon who stated that the candidate's salvation experience was not sufficient. Blackmon Dep. 134:16-137:9; Ex. 31.

until the litigation process in making the decision to terminate Plaintiff. Furthermore, Plaintiff's contract was renewed in March 2018 following these events and she never received any disciplinary action nor was any even insinuated. Ex. 2 at 1. Even up until the filing of its summary judgment motion, Defendant's proffered reasons for its decision have been a moving target with new explanations cropping up in lieu of others that have become less attractive throughout the litigation process. Defendant's apparent abandonment of the Banis argument at this juncture is further evidence of its "shifting reasons" for its actions and strong evidence of pretext. *See Supra* 16 at n.10.

## II.    <u>Title VII Retaliation</u>

### A.    <u>Plaintiff's Prima Facie Case</u>

Mooberry has engaged in a host of protected activity dating back years and continuing throughout her employment up until only days prior to her termination. Ex. 5; Ex. 11. These gender-based complaints relate to inequitable treatment from Small, Barber, and Radebaugh in regard to both Mooberry personally, her female assistant coach, and her female athletic team. Mooberry's complaints were communicated both verbally and in writing to Luke Blackmon (Vice President for Business Affairs), Jeff Barber, Ashton Turner (Senior Women's Administrator), and Lindsey Walke (Director of Human Resources).[23] Defendant does not argue that Plaintiff did not engage in protected activity under either Title VII or Title IX for purposes of making a *prima facie* showing. Nevertheless, to aid in the Court's review, Plaintiff has compiled a summary chart demonstrating some of her opposition activity. Ex. 11.

It is undisputed that Defendant did not renew Mooberry's employment contract and verbally informed her of that decision on February 4, 2019, shortly following her protected activity in both

---

[23] It is undisputed that Barber, Blackmon and Walke were all involved in the decision to not renew Mooberry's contract. Barber Dep. 128:16-25; 129:1-3; Blackmon Dep. 185:18-22. The decision was made "in the days" leading up to the February 4, 2019, meeting with Mooberry. Ex. 24 at 3 – Def's Interrog. No. 5.

late 2018 and early 2019. *Id.* Defendant does not argue that Plaintiff cannot show close temporal proximity between her protected activity and the adverse employment action. Rather, Defendant argues only "temporal proximity alone is insufficient to establish that Plaintiff's engagement in protected activity was the 'but for' cause of the non-renewal of Plaintiff's contract." (ECF No. 34-1 at 21). For purposes of the *prima facie* showing, Mooberry has satisfied her burden. Furthermore, Plaintiff is relying on much more than temporal proximity. *Supra* I(C)-(E).

### B.  Pretext

As this Court has observed, the "but-for" standard "does not require proof that retaliation was the *only* cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *CareAlliance Health Servs.,* 2014 U.S. Dist. LEXIS 137140 at *15; *Foster v. Univ. of Md.-E.Shore,* 787 F.3d 243 (4th Cir. 2015). Notably, Mooberry was never accused of any misconduct *before* she engaged in protected activity. *CareAlliance,* 2014 U.S. Dist. LEXIS 137140 at *38 (observing that more than a temporal connection is required to present a genuine issue of material fact on pretext when employee was accused of misconduct *before* engaging in protected activity). Here, Mooberry was never accused of any misconduct *at all* during her employment and Defendant has submitted no documentary evidence of write-ups or other performance records in her personnel file. Indeed, Defendant itself admits to Plaintiff's unblemished performance record. (ECF No. 34-1 at 21 n.1) ("The record in this matter is bereft of any evidence that Plaintiff was 'written up.'").

Plaintiff has already thoroughly rebutted each of Defendant's proffered explanations and offered her own evidence of pretext in her Title VII discrimination section above. Defendant does not raise any unique arguments with respect to Mooberry's retaliation claim other than to note that Barber alleges he also chose not to renew various male coach's contracts due to similar coaching deficiencies as her.  (ECF No. 34-3 at ¶ 13). Besides the fact that Barber's Affidavit provides no

details whatsoever about the circumstances of those alleged coaching non-renewals, Plaintiff must assume Barber is referencing two male coaches he briefly discussed at his deposition, Matthew Cram-Smith and Eric Terrill. Barber Dep. 53:8-54:6. During discovery, Defendant produced both Cram-Smith and Terrill's full and complete personnel files. In both personnel files there is no documentation whatsoever indicating that either were terminated, whether for having a poor win-loss record or for any other performance related matter and Defendant has offered absolutely no documentary evidence to the Court to support this allegation. In fact, neither personnel file contains *any* disciplinary documentation throughout either's *entire* employment history with CSU. To the contrary, both Cram-Smith and Terrill's personnel files contain a document entitled "CSU ***Resignation*** Checklist." Ex. 27 at 1-2. Furthermore, at least as it relates to Mooberry's retaliation claim, there is no evidence that either Cram-Smith or Terrill presented complaints of gender discrimination to Defendant, like Mooberry.

Defendant also craves reference to its own Interrogatory Response Number 11 as support for its argument. In reviewing that interrogatory response which provides no detailed information other than a vague reference to "unsatisfactory performance," the only two coaches on Defendant's interrogatory list that were allegedly non-renewed under *Barber's tenure* were Cram-Smith and Terrill, discussed above. The others listed as allegedly "unsatisfactorily performing" were males who had all left CSU *before* Barber's tenure (Lofton, Selders[24], and Tucker) or females who had made gender complaints of their own (Tosha Ansley). In sum, Defendant's argument that the decision made as to Mooberry's contract was not unique or discriminatory is unsupported by the evidence of record. A reasonable jury could conclude that Mooberry's contract non-renewal would not have occurred "but-for" her many complaints of gender discrimination.

---

[24] In addition to not working at CSU with Barber, Blackmon testified that Selders was terminated for having a "drinking problem," not for coaching deficiencies. Blackmon Dep. 66:24-67:2.

**III.    Title IX[25]**

> **A. Mooberry's Title IX Claims are Timely Under the Three-Year Personal Injury Statute of Limitations ("SOL") in S.C. Code Ann. § 15-3-530.[26]**

Defendant argues that Mooberry's Title IX claims are time-barred because they were not pursued within 1-year of her being informed that her employment contract was not being renewed. (ECF 34-1 at 22-23). In furthering this argument, Defendant relies exclusively upon an unpublished opinion in a *pro se* case issued by the Fourth Circuit and then submits that "[i]t is settled law that the limitations period applicable to Plaintiff's Title IX claim was one year." *Id.* at 22. Despite Defendant's assertion, as another district court in the Fourth Circuit has correctly noted, "there is no published Fourth Circuit authority directly on point." *Doe v. Va. Polytechnic Inst. & State Univ.,* 400 F. Supp. 3d 479, 495 (W.D. Va. 2019).

> **B. The Intersection of Titles IX, VI and §1983 – The Civil Rights Statutes**

Title IX provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any education program or activity receiving Federal financial assistance . . ." 20 U.S.C.A. § 1681(a). When it was adopted in 1972, Title IX's statutory language was explicitly modeled after its predecessor and companion statute, Title VI. Title VI states that "[n]o person in the United States

---

[25] In *Preston v. Com. of Va. Ex Rel. New River Com. Coll.*, 31 F.3d 203, 206 (4th Cir. 1994), the Court concluded that a Title IX private cause of action extends to employment discrimination on the basis of gender by educational institutions receiving federal funds. The judicial interpretations of Title VII apply to Title IX. Defendant does not raise any distinct legal arguments as to Plaintiff's substantive Title IX claims. Thus, for purposes of her substantive Title IX claims, Plaintiff refers to her prior arguments made with respect to her Title VII claims. Plaintiff's Title IX section will be exclusively dedicated to the statute of limitations argument.

[26] Title IX does not contain a SOL and the four-year federal catch-all in 28 U.S.C. § 1658(a) is inapplicable. In 42 U.S.C. §1988, Congress endorsed an approach for "borrowing" with respect to claims enforceable under the Reconstruction Civil Rights Act. The settled practice is to adopt an analogous local time limitation as federal law if it is not inconsistent with federal law or policy to do so. *Id.*

shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the

benefits of, or be subjected to discrimination under any program or activity receiving Federal

financial assistance." 42 U.S.C. § 2000(d). In recognizing the similarities between the two statutes

and implying a private cause of action under Title IX, the Supreme Court observed,

> Title IX was patterned after Title VI of the Civil Rights Act of 1964. Except for the
> substitution of the word 'sex' in Title IX to replace the words 'race, color, or national
> origin' in Title VI, the two statutes use identical language to describe the benefited
> class. Both statutes provide the same administrative mechanism for terminating federal
> financial support for institutions engaged in prohibited discrimination . . . The drafters
> of Title IX explicitly assumed that it would be interpreted and applied as Title VI had
> been during the preceding eight years.

*Cannon v. Univ. of Chicago,* 441 U.S. 677, 694 (1979). [27] Thus, because Titles VI and IX

"operate in the same manner," case law interpreting one provision is applicable to the other. *See*

*Mohamed for A.M. v. Irving Indep. Sch. Dist.,* 252 F. Supp. 3d 602, 628 n. 14 (N.D. Tex. 2017);

*Yusuf v. Vassar Coll.,* 35 F.3d 709, 714 (2d Cir. 1994) ("Because the statutes share the same goals

and because Title IX mirrors the substantive provisions of Title VI . . ., courts have interpreted Title

IX by looking to the body of law developed under Title VI").

In the Fourth Circuit, like other circuits, Title VI claims borrow the state personal injury SOL.

*Jersey Heights Neighborhood Ass'n v. Glendening,* 174 F.3d 180, 187 (4th Cir. 1999) ("the personal

nature of the right against discrimination justifies applying the state personal injury . . . [SOL]");

*Franks v. Ross,* 313 F.3d 184, 194 (4th Cir. 2002) (applying North Carolina personal injury SOL to

Title VI claim in reliance on *Jersey Heights*).[28] "It is now widely accepted that the statute of

---

[27] Furthermore, Title IX's corresponding regulations adopt the procedures applicable to Title VI. 34
C.F.R. § 106.71 (1988).
[28] *See also Rozar v. Mullis,* 85 F.3d 556. 561 (11th Cir. 1996); *Taylor v. Regents of Univ. of Cali.,* 993
F.2d 710, 712 (9th Cir. 1993); *Egerdahl v. Hibbing Cmty. Coll.,* 72 F.3d 615, 618 (8th Cir. 1995);
*Lillard v. Shelby Cty. Bd. of Educ.,* 76 F.3d 716, 729 (6th Cir. 1996) (in Title IX case stating that "a
number of cases determining the limitations period for judicial proceedings under Title VI provide
guidance by analogy. Indeed, all of the circuits deciding the issue have uniformly applied the state
personal injury limitations period."); *Thomas v. Care Plus of New Jersey, Inc.,* 484 F. App'x 692,

limitations applied in most civil rights claims corresponds with the state's statute of limitations for personal injury actions." *Smith v. Goodwin,* 2003 U.S. Dist. LEXIS 22133 at *6-7 (E.D. Va. May 2, 2003) (collecting civil rights cases from Fourth Circuit adopting personal injury SOL and concluding Title VI claim follows personal injury SOL).

In addition to Title VI, Title IX is also analogous to §1983 – "both statutes [Title IX and §1983] prohibit gender discrimination by state-run schools that receive federal funds," and include employment derived-sexual harassment claims. *Egerdahl,* 72 F.3d at 618. With respect to these employment derived sexual-harassment claims, the law is well-settled that all §1983 claims borrow the state personal injury SOL. *Wilson v. Garcia*, 471 U.S. 261 (1985).

### C. The Federal Interest in Uniformity and Certainty Set Forth in *Wilson* Equally Applies to Title IX.

The Supreme Court's analysis in *Wilson* is paramount to the discussion of which SOL the Court should apply and has largely been relied upon by other circuits in coming to the consensus that *all* Title IX claims should follow the state personal injury SOL. *Egerdahl,* 72 F.3d at 618 ("We think that the District Court's decision is inconsistent with *Wilson v. Garcia*" and concluding that same reasoning as to §1983 should apply to Title VI and Title IX claims). In *Wilson*, the Supreme Court noted that with respect to **all** §1983 claims, the state personal injury SOL should apply. *Wilson v. Garcia,* 471 U.S. 261 (1985). The Court observed that §1983 covered numerous different topics ranging from mistreatment of schoolchildren, deliberate indifference to the medical needs of prison inmates, *discrimination in public employment on the basis of race* or the exercise of First Amendment rights, use of excessive force, etc. *Id.* at 265. Thereafter, the Court noted that:

---

693 (3d Cir. 2012); *Frazier v. Garrison I.S.D.,* 980 F.3d 1514, 1521 (5th Cir. 1993) (affirming and stating that the "district court held that since Title VI, like § 1983, involved a claim of discrimination in public employment, considerations of fairness and uniformity dictated the same statute of limitations apply to a Title VI claim as to a § 1983 claim."); *Bush v. Commonwealth Edison Co.,* 990 F.2d 928, 933 (7th Cir. 1993) ("The Supreme Court has held that in borrowing statutes of limitations for federal civil rights cases the courts should look to state statutes governing personal injury suits.").

> If the choice of the statute of limitations were to depend upon the particular facts or
> the precise legal theory of each claim, counsel could almost always argue, with
> considerable force, that two or more periods of limitations should apply to each § 1983
> claim. Moreover, under such an approach, different statutes of limitations would be
> applied to the various §1983 claims arising in the same State.

*Id.* Like §1983, Title IX is a broad civil rights statute that encompasses a wide catalog of diverse topics ranging from student/peer sexual abuse/misconduct; teacher/student or student/teacher sexual abuse/misconduct; gender discrimination in athletic programs; athletic team elimination cases; gender discrimination by schools against students in school admission or other student disciplinary procedures; discrimination or harassment based on a student's pregnancy; equal restroom access by transgender students; employment discrimination on the basis of gender; and retaliation for any students or employees who face negative consequences because they filed a Title IX complaint or lawsuit; undoubtedly among many others. Like §1983, it is unlikely that Congress actually foresaw the wide diversity of claims Title IX would ultimately embrace. *Wilson,* 471 U.S. at 266.[29]

Under all three civil rights statutes, there is a strong tradition of viewing discrimination as a "fundamental injury to the individual rights of a person." *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 661 (1987) (extending *Wilson* reasoning to all §1981 claims). And in determining which state SOL statute to "borrow," the issue is not what SOL the *state legislature* intended to apply to federal actions and, thus, speculation about the intent of state legislators or state statutory interpretation is irrelevant to the analysis. *Stanley v. Trs. of the Cal. State Univ.,* 433 F.3d 1129 (9th Cir. 2006)

---

[29] There is also a great deal of conflicting case law in the Fourth Circuit relating to the appropriate SOL to apply in §504 Rehabilitation Act cases. Unlike Title IX and §1983, however, the catalog of topics that cover 504 claims is much narrower. As such, the Supreme Court's directive in *Wilson* regarding the need for judicial uniformity would, arguably, have less application. *See Kramer v. Regents of the Univ. of Cal.,* 81 F. Supp. 2d 972 (N.D. Cal. June 1, 1999) ("Unlike the broad §1983 claims in *Wilson*, here the more specific nature of the ADA . . ."); *Wolsky v. Medical Coll. of Hampton Rds.,* 1 F.3d 222 (4th Cir. 1993) (in Rehabilitation Act case, concluding that because Virginia Act's language almost precisely tracked Rehabilitation Act's language, *both only afforded equitable remedies*, portions of the Virginia Act directly quoted from the Rehabilitation Act and the Rehabilitation Act did not cover the same wide variety of claims or broad purposes of §1983, applying Virginia SOL).

(referencing *Wilson,* 471 U.S. at 269). Rather, "the essential inquiry for statute of limitations 'borrowing' is the nature of the harm alleged . . ." *Id.* at 1135. Here, the nature of the harm alleged is an injury directly to the person, just as it is in Title VI and §1983 discrimination claims.

###    D.    Conflicting Case Law in the Fourth Circuit

Defendant cites to the unpublished 2006 per curiam decision issued in *Moore v. Greenwood Sch. Dist. No. 52,* and the district court decisions that have relied upon *Greenwood* for support that Plaintiff's Title IX claim is untimely. 195 F. App'x 140, 143 (4th Cir. 2006) (unpublished, per curiam); *Martin v. Clemson Univ.,* 654 F. Supp. 2d 410 (D.S.C. 2009).[30] Some background on the *Greenwood* decision and the conflicting authorities that have developed in its wake is appropriate. As an initial matter, *Greenwood* was a *pro se* appeal and the plaintiff forwarded only a Title IX retaliation claim. None of the arguments presented herein were made to the *Greenwood* court. The *Greenwood* analysis regarding the SOL issue is comprised of a single paragraph and cites only to one South Carolina Supreme Court case, *Orr v. Clyburn,* and one district court opinion that cited to *Orr*. *Greenwood Sch. Dist. No. 52* at 143 (citing *Taylor v. Cummins Atlantic, Inc.,* 852 F. Supp. 1279, 1283 n.2 (D.S.C. 1994) and *Orr v. Clyburn,* 277 S.C. 536 (S.C. 1982)). A review of both of the cases cited by the *Greenwood* court illustrates that neither dealt with Title IX or even statutes of limitation at all. They simply noted in general fashion that SCHAL language tracks that of Title VII and the ADEA. In providing negative treatment to *Greenwood,* a Maryland District Court more recently noted "the *Greenwood* court based its decision on an isolated federal district court case and an opinion from the South Carolina Supreme Court" and "the *Greenwood* court completely failed to explain wherein these two South Carolina cases dictated the application of SCHAL to the teacher's

---

[30] *Martin v. Clemson Univ.* arose shortly after Greenwood from the same Court and in its analysis the Court indicated that it had itself issued the initial ruling in *Greenwood,* which the Fourth Circuit had previously affirmed in an unpublished decision. Thus, the court in *Clemson* simply followed its own prior holding in *Greenwood*.

[Title IX] retaliation claim." *Doe v. Bd. of Educ. of Prince George's Cty.,* 888 F. Supp. 2d 659, 664 (D. Md. 2012).

Complicating matters for the district courts, the year after the unpublished opinion in *Greenwood*, the Fourth Circuit issued another unpublished Title IX opinion in *Wilmink v. Kanawha County Bd. of Educ.,* 214 Fed. App'x. 294, 296 n. 3 (4th Cir. 2007). *Wilmink* did not mention *Greenwood* and although the case dealt with allegations of sexual misconduct by a teacher against a student, the Fourth Circuit observed in general and unqualified fashion that "every circuit to consider the issue has held that Title IX [, like § 1983] borrows the relevant state's statute of limitations for personal injury." *Id.* The Court then tellingly provided a string cite to the wealth of other circuit courts that have concluded in unqualified fashion that Title IX claims are uniformly subjected to the state's personal injury SOL under the theory they should track Title VI and §1983 statutes of limitation as corresponding civil rights statutes and based on the uniformity directive of *Wilson. Id.* (*citing Stanley v. Trustees of Cali. State Univ.,* 433 F.3d 1129, 1134 (9th Cir. 2006); *Curto v. Edmundson,* 392 F.3d 502, 503-04 (2d Cir. 2004); *Bougher v. Univ. of Pittsburgh*, 882 F. 2d 74, 77-78 (3d Cir. 1989); *Lillard v. Shelby County Bd. of Educ.,* 76 F. 3d 716, 729 (6th Cir. 1996); *Egerdahl v. Hibbing Cmty. Coll.,* 72 F. 3d 615, 618 (8th Cir. 1995); *M.H.D. v. Westminster Schs.,* 172 F. 3d 797, 803 (11th Cir. 1999)).[31]

In the wake of *Greenwood, Wilmink,* and the unanimous out-of-circuit authority pointing to application of the state personal injury SOL for all types of Title IX claims, the district courts within

---

[31] *See also King-White v. Humble Indep. Sch. Dist.,* 803 F. 3d 754, 759 (5th Cir. 2015) ("While this court has not yet considered the appropriate limitations period for Title IX claims, *every other circuit to have considered the matter in a published opinion has concluded that Title IX is subject to the same limitations period as § 1983*. We now join our sister circuits and hold that Title IX should be treated like § 1983 for limitations purposes. We find the Eighth Circuit's opinion in *Egerdahl* . . .particularly persuasive on this point. The court in that case recognized that Title IX is 'analogous to § 1983' and is modeled after Title VI, which itself is 'controlled by the same considerations which inhere in . . . § 1983 claims." (emphasis provided).

the Fourth Circuit have understandably struggled with how to apply statutes of limitation in Title IX and Title VI cases. Most have attempted to navigate around the conflicting authority by drawing factual distinctions, where appropriate. *See Doe v. Bd.,* 888 F. Supp. 2d at 664 (noting conflict in authorities but adopting *Wilmink* and personal injury SOL over Human Relations Act SOL based on theory that claim was student/peer sexual harassment like *Wilmink*, but expressing general skepticism over *Greenwood's* analysis even in the employment setting); *Isioye v. Coastal Carolina Univ.,* 2018 U.S. Dist. LEXIS 213538 (D.S.C. Nov. 30, 2018) (applying SC personal injury SOL to Title IX claim factually predicated on student relationship and sexual misconduct allegations); *Rouse v. Duke Univ.,* 869 F. Supp. 2d 674, 683 (M.D.N.C. 2012) (applying NC personal injury SOL to Title IX claim factually predicated on student sexual assault claim and following *Wilmink*).

An individualized claim-by-claim analysis is precisely what the Supreme Court cautioned against in *Wilson* with respect to Title IX's sister civil rights statute, §1983. As the Court observed in the §1983 setting,

> Congress intended the identification of the appropriate statute of limitations to be an uncomplicated task for judges, lawyers, and litigants, rather than a source of uncertainty, and unproductive and ever-increasing litigation. Moreover, the legislative purpose to create an effective remedy for the enforcement of federal civil rights is obstructed by uncertainty in the applicable statute of limitations, for scarce resources must be dissipated by useless litigation on collateral matters.

*Wilson,* 471 U.S. at 266. This cautionary language has been the impetus for other circuits, as cited to by the Fourth Circuit in *Wilmink,* to adopt a uniform application of the state personal injury SOL for *all* Title IX claims, regardless of the underlying factual predicate.[32]

---

[32] *See Palmer v. Santa Rosa Cty.,* 2005 U.S. Dist. LEXIS 34314 (N.D. Fla. Dec. 8, 2005) (in Title IX student discrimination case, declining to apply FL Educational Equity Act SOL which was directly on point, covered gender discrimination, and even tracked language of Title IX and, instead, applying personal injury SOL based on *Wilson* directive); *Beasley v. Alabama State Univ.,* 966 F. Supp. 1117 (M.D. Ala. 1997) (collecting cases) ("It is now well settled that Title IX claims, like actions under §1983 and other civil rights statutes, are subject to the limitations periods for personal injury actions under state law."); *Legoff v. Trustees of Boston Univ.,* 23 F Supp. 2d 120 (D. Mass. 1998) (in

### E.  SCHAL Does not Provide the Same Rights and Remedies as Title IX.

Even if the Court does not agree the *Wilson* uniformity directive applies to Title IX or that Title IX should follow its companion civil rights statutes and the near unanimous case law adopting the state personal injury SOL, as the Fourth Circuit has articulated, a state statute is only analogous when it provides substantially "the same rights ***and remedies***" as the federal law. *Semenova v. Md. Transit Admin.,* 845 F.3d 564, 567 (4th Cir. 2017) (emphasis provided). Here, Title IX explicitly tracks the language of Title VI, discussed above. SCHAL, however, does not track the language of Title IX. Additionally, the purposes of Title IX and SCHAL do not align. As the Supreme Court noted in *Cannon,* "Title IX, like its model Title VI, sought to accomplish two related . . . objectives. First, Congress wanted to avoid the use of federal resources to support discriminatory practices; second, it wanted to provide individual citizens effective protection against those practices." *Cannon,* 441 U.S. at 704. The Court went on to note that under Title IX the first purpose was served by providing a *statutory procedure for termination of federal financial support* for institutions engaged in discriminatory practices, something that does not relate at all to the SCHAL or its purposes. *Id.* SCHAL contains no administrative process at all for withdrawal of federal funds (or state funds) to educational institutions engaged in discrimination because that is not one of its purposes.

Also noteworthy is that Title IX allows a private right of action *without* the need for any administrative exhaustion. *Fitzgerald v. Barnstable Sch. Comm.,* 555 U.S 246, 255 (2009). SCHAL, however, creates a very specific mandatory administrative exhaustion regime demonstrating preference for prompt identification and resolution of employment disputes over providing financial compensation to victims deprived of their civil rights. Additionally, and as noted by this District

---

employment discrimination case under Title IX, applying state personal injury SOL based on *Wilson* and *Goodman Lukens Steel Co.*); *Nelson v. Univ. of Me. Sys.,* 914 F. Supp. 643 (D. Me. 1996) (in employment retaliation case under Title IX, applying Maine personal injury SOL over Maine Human Rights Act SOL and providing discussion about intersection of civil rights statutes and *Wilson*).

Court in *Arclabs,* SCHAL does not protect the same types of *non-*employment discrimination claims that Title IX does, such as the specific protections for students. *Gresham v. Arclabs, LLC,* 9:19-cv-1237-RMG, 2019 U.S. Dist. LEXIS 114385 (D.S.C. July 10, 2019) (applying S.C. personal injury SOL to student Title IX discrimination claim).[33]

Most critically, under SCHAL a plaintiff may only "bring an action *in equity* against the respondent in circuit court." S.C. Code. Ann. § 1-13-90(d)(6). In other words, the SCHAL does not provide for a jury trial in a matter concerning civil rights. As to the specific damages available under Title IX, the Supreme Court has noted that "Congress did not intend to limit the remedies available in a suit brought under Title IX." *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60, 72 (1992) (rejecting limiting Title IX plaintiffs to monetary relief that is only equitable in nature). Unlike Title IX, however, SCHAL provides only very limited equitable remedies: discretionary back-pay, possible reinstatement, and potentially "other *equitable relief* as the court deems appropriate." S.C. Code Ann. 1-13-90(d)(9) (emphasis provided). The SCHAL does not allow for compensatory damages, more than two years of back-pay (which appears to be wholly discretionary), front-pay, or attorneys' fees. The remedies available between SCHAL and Title IX (or even Title VII, for that matter) do not even closely overlap.[34]

---

[33] Defendant does not mention in its brief that Mooberry was *both* a student and an employee of CSU at the time of her termination. Ex. 3 - Mooberry Decl. ¶¶ 14-16. *Greenwood* nor any of the cases that cite to it deal with this unique factual scenario.

[34] In contrast, the Maryland Fair Employment Practices Act ("MFEPA"), effective October 1, 2007, granted employees a private cause of action **allowing for a jury trial, compensatory damages, punitive damages, and attorneys' fees and costs**. Md. Code Ann.§ 20-1013. Thus, the remedies available under MFEPA are substantially more aligned with Title IX than those under the SCHAL. *See Ott v. Md. Dep't of Pub. Safety & Corr. Servs.,* 909 F.3d 655 (4th Cir. 2018) (in employment disability discrimination case under Rehab Act, applying MFEPA SOL because it provided the "same rights and remedies," and MFEPA largely identically tracked language of Rehab Act); *Washington v. Univ. of Md.,* 2020 U.S. Dist. LEXIS 176009 (D. Md. Sept. 24, 2020) ("**As a result of recent amendments to MFEPA**, both statutes now provide a private cause of action against state-entities for sex-based employment discrimination and retaliation **and permit similar remedies**.") (emphasis provided). As such, cases applying MFEPA should be analyzed with caution.

IV.    **Equal Pay Act**

"The EPA prohibits gender-based discrimination by employers resulting in unequal pay for equal work." *EEOC v. Md. Ins. Admin.,* 879 F.3d 114, 120 (4th Cir. 2018). "To establish a prima facie case under the EPA, a plaintiff must demonstrate: (1) the employer paid different wages to an employee of the opposite sex, (2) for equal work on jobs requiring equal skill, effort, and responsibility, which jobs (3) all are performed under similar working conditions." *Evans v. Int'l Paper Co.,* 936 F.3d 183, 196 (4th Cir. 2019). "Wages" are defined and codified at 29 C.F.R. § 1620.10 and include bonus payments and incentive compensation. *Brown v. Clarke Power Services, Inc.,* 2009 U.S. Dist. LEXIS 41700 (S.D. Ohio May 18, 2009) (collecting cases).

If a plaintiff makes a prima facie case, "the burdens of production *and* persuasion shift to the defendant-employer to show that" one of the EPA's affirmative defenses justifies the wage differential. *Id.* (emphasis in original). The EPA identifies four affirmative defenses that an employer may raise to justify a wage differential, although only one is at play in this case. 29 U.S.C. § 206(d)(1). As it relates to the fourth potential catch-all affirmative defense, a "differential based on any other factor other than sex," a defendant will not meet its burden simply "by articulating a legitimate non-discriminatory reason for the employment action." *Price v. N. States Power Co.,* 664 F.3d 1186, 1191 (8th Cir. 2011). The Fourth Circuit has concluded that an employer must submit evidence from which a reasonable factfinder could conclude not merely that the employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons do *in fact* explain the wage disparity. *EEOC v. Md. Ins. Admin.,* 879 F.3d. at 120 (4th Cir. 2018). "When the defendant produces evidence supporting its affirmative defense, the burden of production shifts back to the plaintiff who must come forward with specific facts showing that there is a genuine issue for trial." *Brinkley,* 180 F.3d at 614.

37

A.    **Mooberry's** *Prima Facie* **Case under the EPA**

Here, Mooberry points to her immediate male successor in her same exact position as the Head Women's Volleyball Coach as a comparator for her EPA claim. It is well-settled law that a plaintiff may point to her male successor as a proper comparator. *Brinkley-Obu v. Hughes Training,* 36 F.3d 336 (4th Cir. 1994). "Clearly, two persons holding the same position in immediate succession at the same location satisfies the 'same establishment' requirement, *as well as the requirement that the two jobs involve substantially similar skills, efforts and responsibilities.*" *Persales v. Am. Ret. Corp.,* 2005 U.S. Dist. LEXIS 22630 (W.D. Tex. Sept. 26, 2005) (emphasis provided).

In likely recognition that McFatrich is a proper comparator, Defendant offers only the unfounded argument that McFatrich allegedly had "additional duties" that Mooberry did not have, thus making them not sufficiently similar. However, Mooberry did all of the job duties that Defendant claims McFatrich performs. Ex. 3 – Mooberry Decl. ¶¶ 5-9. For example, Mooberry was required to follow NCAA regulations including those relating to "sports agents" and accounting for receipt of various forms of athletically-related income because they are *NCAA directives* not specific to McFatrich.[35] *Id.* at ¶ 9. In addition to her regular core duties, Mooberry also had to fundraise, prepare a fundraising plan and communicate regularly with administrator Catherine Roys. *Id.* at ¶ 7. She was also required to and did make herself available for media appearances. *Id.* at ¶ 8. Likewise, Mooberry had to ensure that her own staff and student-athletes complied with school and NCAA policies, and that the athletes and recruits met the standards and goals regarding academics. *Id.* at ¶ 6. Lastly, she was certainly responsible for operating summer camps and absorbing those costs, as many of her complaints relate directly to inequities in the operation of her camps. Ex. 5.[36]

---

[35] Perhaps with McFatrich's history of violating NCAA rules Defendant felt obligated to specifically delineate NCAA compliance mandates in his contract.

[36] Defendant cites to *Spencer v. Va. State Univ.,* to support its position. 919 F.3d 199 (4th Cir, 2019). In *Spencer,* the plaintiff sought to compare herself to all other university professors at the entire

### i. One-Year versus Three-Year Term Contract

As to the issue of unequal payment of wages, Mooberry was only ever provided a one-year term contract with Defendant. Ex. 2. She was never offered a multi-year contract despite her specific requests for such and despite the testimony of Barber that multi-year contracts are "industry standard." Barber Dep. 72:2-9. At the time of her termination, Mooberry's base salary was $55,550.00 and the total value of her 1-year contract was $55,550.00. David McFatrich, however, was automatically provided a 3-year term contract at the time of his initial hire, the total contract value of which was $162,241.00.[37] Therefore, the difference between the total value of Mooberry's and McFatrich's contracts was $106,691.00 ($162,241.00 - $55,550.00 = $106,691.00). Defendant does not address the difference in Mooberry's 1-year contract versus McFatrich's 3-year contract in its brief or offer any argument in this regard.

### ii. Academic Achievement Bonus

In addition to receiving a more lucrative 3-year contract, McFatrich's multi-year contract also contained an "academic achievement" incentive/bonus providing a $5,000.00 bonus if the women's volleyball team grade point average was 3.25 or higher at the end of a spring academic semester. Ex. 14 at 3. Mooberry's contract contained no such incentive term. Ex. 2.[38]

### B.    Defendant's Affirmative Defense Is Pretextual.

As it relates to its affirmative defense, Defendant argues only that inclusion of the academic achievement bonus in McFatrich's contract was part of a gender-neutral revamp of all coaches'

---

university, including professors in entirely different departments and professors that taught at the graduate versus the undergraduate level. *Spencer* does not assist Defendant when Plaintiff's proposed comparator is her very own replacement in her very own department coaching the very same athletic team under the same Athletic Director.

[37] McFatrich's first year salary was pro-rated on a daily basis. Thus, the technical value of his term contract is: (Y1$51,141.00 + Y2$55,550.00 + Y3$55,550.00 = $162,241.00).

[38] In the spring 2019 semester (the term in which Mooberry was terminated in late February), the women's volleyball team went on to achieve a cumulative team GPA of 3.752. Ex. 29.

contracts under Barber's tenure. At his deposition, Barber testified that in January 2019 he started adding incentives to _all coaching contracts_ to make the contracts "more Division 1." Barber Dep. 68:13-22. He went on to testify that the modification applied to "any new [coaching] contracts, any renewals, _any contracts at all_." _Id._ at 68:22-69:2. He also testified that _all coaches_ had an academic bonus effective in 2019. _Id._ at 69:10-12. In order to warrant summary judgment, the Fourth Circuit requires more than a mere showing that Defendant's explanation _could_ explain the wage disparity – it must show that it _in fact_ explains the disparity. Here, Defendant's proffered explanation does not meet this heavy burden and a reasonable jury could find that this explanation is pretextual.[39]

Defendant failed to provide the Court with at least one employment contract for an employee under Barber's tenure. Anca Dumitrescu, the female Head Coach of the Women's Tennis team is currently employed on a contractual basis with a term lasting through May 31, 2021. Ex. 30. Notably, despite Barber's testimony that _every coach had the academic bonus_ after his revamp, Dumitrescu's employment contract contains no academic achievement incentive bonus. _Id._ Although Dumtriescu originally renewed in August 2018 for a term lasting through 2021, there have been no modifications, addenda or updates made to her contract. This discredits Barber's testimony that all coaches have the academic incentive bonus and that _all contracts_ were modified in uniform fashion, whether renewals, new contracts, or "_any contracts at all._" Barber Dep. 68:20-69:12. Therefore, Defendant's argument in this regard does not _in fact_ explain the disparity between the academic incentive bonus contained in McFatrich's contract sufficient to warrant summary judgment.

---

[39] Defendant does not raise any affirmative defense as to the provision of a 3-year contract to McFatrich. Defendant's bonus defense does not extend to the contract length issue because Defendant was regularly providing multi-year contracts to male coaches well prior to Barber's arrival. For example, as far back as 2005 the Head Men's Basketball Coach was employed on a 4-year contract basis. Ex. 28.

Respectfully submitted,


Falls Legal, LLC

*s/ J. Scott Falls*
J. Scott Falls
Attorney Identification No. 10300
scott@falls-legal.com
Ashley L. Falls
Attorney Identification No. 12083
ashley@falls-legal.com
245 Seven Farms Drive, Suite 250
Charleston, SC 29492
Tel: (843) 737-6040
Fax: (843) 737-6140


Newkirk Zwagerman, P.L.C.
Jill Zwagerman
IA Bar No.  AT0000324
jzwagerman@newkirklaw.com
521 E. Locust Street, Suite 300
Des Moines, IA  50309
Tel: (515) 883-2000
Fax: (515) 883-2004
*Admitted Pro Hac Vice*

Attorneys for Plaintiff




Charleston, South Carolina
May 27, 2021